IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 3:CR-07-076 |
| | : | |
| v. | : | |
| | : | (JUDGE CAPUTO) |
| | : | |
| TIMOTHY YEAKEL, | : | |
| | : | |
| Defendant | : | |

**MEMORANDUM**

**I.   BACKGROUND**

On February 27, 2007, Defendant Timothy Yeakel was indicted on 18 U.S.C. § 922 (g)(1), felon in possession of a firearm. Defendant moved for a psychiatric examination on May 16, 2007. (Doc. 25.) The Court granted Defendant's motion on May 29, 2007. (Doc. 30.) The Court entered an Order granting the Government's motion to further evaluate Defendant's ability to attain competence to stand trial (Doc. 37) on September 13, 2007. (Doc. 39.) The report regarding Defendant's ability to obtain competence was received by the Court on March 31, 2008. In this report, the Government requests that Defendant Yeakel be involuntarily medicated to restore his competency to proceed to trial. A hearing was held on May 30, 2008 to determine whether Mr. Yeakel should be administered psychotropic drugs against his will. The expert opinion of a psychologist, Robert E. Cochrane, Psy.D., and a psychiatrist Bryon Lee Herbel, M.D. were offered. Each testified that Mr. Yeakel suffered from Delusional Disorder and that the administration of drugs would likely render him competent to stand trial. Both experts opined there was a 70% to 80% chance the

administration of drugs would be successful in rendering Mr. Yeakel competent to stand trial.  Dr. Herbel testified the drug proposed for use, Zyprexa, has side effects which included sedation, muscle stiffness, tremor, constipation and approximately a 5% chance of diabetes.  Each testified there was no alternative that was less intrusive than the one proposed.  Each expert testified they would propose this treatment to a family member.  Of particular note is that the information concerning the use of the proposed drug is from the data base dealing with schizophrenia, not delusional disorder, which is so rare there is no data base.  Also of note is that there is no evidence that what Mr. Yeakel says is not true.  The experts did not recount any evidence that Mr. Yeakel's statements were untrue.  Indeed, the conspiracy theory noted in the report as well as the so-called distortion of facts are opinions essentially based upon Mr. Yeakel's lack of flexibility regarding the events about which he speaks.  Both witnesses agreed that Mr. Yeakel was not dangerous to himself or to others.

**II.   DISCUSSION**

*A.  Forced Medication for Another Purpose*

In *United States v. Grape*, 509 F. Supp. 2d 484 (W.D. Pa. 2007), the Court noted that the first inquiry a court must consider is whether "forced medication is warranted for a *different* purpose." *Sell*, 539 U.S. at 182 (emphasis in original). The *Sell* Court cited the Supreme Court decision in *Harper*, noting that a court should first consider whether involuntary medication is warranted for a purpose other than competency at trial, such as based upon the defendant's dangerousness, or where the refusal to take medication puts the defendant's health at grave risk. *Sell*, 539 U.S. at

181-82 (citing *Harper*, 494 U.S. at 225-26). The *Harper* Court noted that the Due Process Clause "permits the State to treat a prison inmate with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper*, 494 U.S. at 227.

The Supreme Court in *Riggins v. Nevada*, 504 U.S. 127 (1992) considered the use of antipsychotic drugs on a pre-trial detainee over the objection of the defendant. In *Riggins*, the Court noted that *Harper* dealt with a prison inmate, and that the Fourteenth Amendment affords at least as much protection to a detained person as a prison inmate. *Id.* at 135. The Court found that the government "certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others." *Id.*

The Supreme Court noted in *Sell* that "[t]here are often strong reasons for a court to determine whether forced administration of drugs can be justified on . . . alternative grounds before turning to the trial competence question." *Sell*, 539 U.S. at 182. The Court further noted that "the inquiry into whether medication is permissible, say, to render an individual non-dangerous is usually more 'objective and manageable' than the inquiry into whether medication is permissible to render a defendant competent." *Id.* (quoting *Riggins*, 504 U.S. at 140 (Kennedy, J., concurring in judgment)). Therefore, the first inquiry in determining whether Mr. Yeakel should be invol-

untarily medicated is if it is for a reason other than for trial competence. Here, the evidence is that Mr. Yeakel is not a danger to himself or others.

### B. Forced Medication for Competence to Stand Trial

When the government wishes to forcibly medicate a defendant, the district courts usually hold a *Sell* hearing, in which evidence is presented regarding the factors required in *Harper* above and those required in *Sell* below. In *Sell*, 539 U.S. 166, 179-80, the Court held that a court may require involuntary medication "solely for trial competence purposes in certain circumstances." In considering *Harper* and *Riggins*, the Supreme Court in *Sell* stated that "the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial, but only if the treatment is medically appropriate, is substantially unlikely to have side effects that may undermine the fairness of the trial, and taking account of less intrusive alternatives, is necessary significantly to further important government trial-related interests." *Sell*, 539 U.S. at 179-80.

The Defendant has a constitutional right to deny unwanted medical treatment protected by the Fifth and Fourteenth Amendment. The Supreme Court has held that such a liberty interest can only be overcome by an "essential" or "overriding" state interest. *Riggins v. Nevada*, 504 U.S. 127, 134, 135 (1992); *Washington v. Harper*, 494 U.S. 210, 221 (1990). Furthermore, courts have required the government to bear the burden of proving its case by clear and convincing evidence. *United States v. Schloming*, No. 05-0517 (TJB), 2006 WL 1320078, at * 3 (D.N.J. May 12, 2006) (citing

*United States v. Gomes*, 387 F.3d 157, 160 (2d Cir. 2004); *United States v. Bradley*, 417 F.3d 1107, 1114 (10th Cir. 2005)).

In analyzing a *Sell* motion for involuntary medication, district courts consider four (4) factors: (1) that important government interests are at stake; (2) that involuntary medication will significantly further the important government interest (meaning that the involuntary medication is substantially likely to render the defendant competent to stand trial); (3) that involuntary medication is necessary to further the important government interests (whether there are any alternative, less intrusive treatments likely to achieve substantially the same results); and (4) whether administration of the drugs is medically appropriate (whether the treatment is in the patient's best medical interest in light of his medical condition). *See Grape*, 509 F. Supp. 2d at 491 (citing *Sell*, 539 U.S. at 180-81.)

### 1. Important Government Interest

The first consideration is whether an important government interest is at stake. The Supreme Court in *Sell* noted that the interest "in bringing to trial an individual accused of a serious crime is important." *Sell*, 539 U.S. at 183. Therefore, the first inquiry is whether the crime is a serious one. While *Sell* does not elaborate on the meaning of a "serious" offense, the district court for the District of New Jersey in *United States v. Schloming*, No. 05-0517 (TJB), 2006 WL 1320078 (D.N.J. May 12, 2006) noted that crimes such as a felon in possession of a firearm have been found to constitute a serious offense. *Id.* at *4 (citing *United States v. Gomes*, 387 F.3d 157, 161 (2d Cir. 2004)).

The *Sell* Court also noted that in determining whether an important government interest exists, the court "must consider the facts of the individual case. . . Special circumstances may lessen the importance of the interest." *Sell*, 539 U.S. at 183. The Court noted that "[t]he defendant's failure to take voluntarily, for example, may mean lengthy confinement in an institution for the mentally ill - and that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Special circumstances have diminished the government interest in cases where (1) time served plus time to regain competency could result in confinement longer than the potential sentence and (2) where the likelihood of reentering society was low because of the possibility of civil commitment. *United States v. Schloming*, No. 05-0517 (TJB), 2006 WL 1320078 (D.N.J. May 12, 2006).

I conclude there is an important government interest.

### 2. *Whether Treatment Significantly Furthers Government's Interests*

The second factor considers whether involuntary medication will significantly further the important government interest. In determining whether the government interest will be furthered, the court must consider if the involuntary medication is substantially likely to render the defendant competent to stand trial. *Sell*, 539 U.S. at 180. However, the court "must find that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.* at 181. The court must therefore consider both the likelihood that the medication will

render the defendant competent.  The court must also consider the side effects of the medication, and the seriousness of those side effects.

Here while the testimony is there is a substantial likelihood the drugs will render Mr. Yeakel competent to stand trial, the opinion is based not on a data base dealing with his diagnosed malady, delusional disorder, but rather on the data base concerning schizophrenia.  Moreover, while many of the side effects are reversible with lower doses, the prospect of contracting diabetes is very real.  A 5% chance of becoming a diabetic is not outweighed by the government interest in prosecuting Mr. Yeakel for this crime.  This is especially so considering the use of the schizophrenic data base to reach the conclusion on the selection of drugs and their success rate and the lack of concrete evidence that Mr. Yeakel's representations concerning the events surrounding the crime with which he is charged are not true.

I conclude this factor is not established by clear and convincing evidence.

### 3. *Less Intrusive Means*

The third *Sell* prong considers the necessity of the involuntary medication.  The question here is whether there are any alternative, less intrusive treatments likely to achieve substantially the same results.  *Sell*, 539 U.S. at 181.  For example, the Court must consider whether "a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id.*  Similarly, the court may consider if non-drug therapies, such a counseling, would achieve substantially the same results as the medication.  None of these options are applicable here.

### 4. *Medical Appropriateness of the Treatment*

The final *Sell* factor considers whether administration of the drugs is medically appropriate. This factor addresses whether the treatment is in the patient's best medical interest in light of his medical condition. *Sell*, 539 U.S. at 181. The *Sell* Court noted that "[t]he specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id.* The *Schloming* court also noted the difficulty in determining whether involuntary administration of antipsychotic drugs was in the patient's best interest. The court noted that, objectively, administration would be in the defendant's best interest, as it would improve his condition. *Schloming*, 2006 WL 1320078 at *9. However, subjectively, the *Schloming* court noted that the Defendant did not want to be medicated. *Id.* "

> The question of whether the medication of an individual who does not wish to be medicated is a tortured one. This Court has laid witness to the ravages of the Defendant's diseased mind. It is saddening to know what he was, what he has become, and what he could be if he agreed to take the medication prescribed. It is, however, equally saddening to envision him forcibly medicated and potentially suffer significant side effects from said mediation, medication he did not want nor voluntarily ingested. Therein lies the conundrum. If the Defendant were not mentally ill, would he agree to take the medication? If he is not medicated, how will we know?

*Id.* at *10.

## III.  CONCLUSION

To require a defendant to be involuntarily medicated, the court must find that the government has established the above four (4) factors by clear and convincing

evidence. As the defendant has a constitutional liberty interest in avoiding involuntary administration of antipsychotic drugs, only an essential or overriding state interest may overcome that right. *Sell*, 539 U.S. at 178-79. *See also Schloming*, 2006 WL 1320078 at *4 ("The *Sell* criteria, taken as a whole, must outweigh a Defendant's significant interest in avoiding the unwanted administration of antipsychotic drugs. . . . Each of the *Sell* criteria must be met in order to show that the Government's interests are overriding. If not, the Defendant's rights remain paramount, and the Government's Motion must be denied."). However, the *Sell* Court noted that instance when a defendant may be medicated for competency purposes "may be rare." *Id.* at 180.

In the instant case, I have determined that the Government has not proven by clear and convincing evidence that Mr. Yeakel should be medicated against his will. In particular, I have found that the risk of the side effect of diabetes coupled with the lack of a specific data base relating to the use of the proposed drug for delusional disorder falls short of the clear and convincing evidence needed to show the furtherance of the Government's interests.

Therefore, the Government's request that Mr. Yeakel be involuntarily medicated to restore his competency to proceed to trial will be denied.

An appropriate Order follows.


Date: __July 9, 2008__          /s/ A. Richard Caputo_____
                                       A. Richard Caputo
                                       United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CASE NO. 3:CR-07-076 |
| | : | |
| v. | : | |
| | : | (JUDGE CAPUTO) |
| | : | |
| TIMOTHY YEAKEL, | : | |
| | : | |
| Defendant. | : | |

# ORDER

**NOW**, this ___9th__ day of July, 2008, **IT IS HEREBY ORDERED** that the Government's request that Mr. Yeakel be involuntarily medicated to restore his competency to proceed to trial is **DENIED**.

/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge